UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JANELLA KNIERIM, *Personal* | ) | |
| *Representative of the Estate of* | ) | |
| *Patrick Joseph Knierim, Deceased,* | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | 2:09-cv-00367-LJM-DKL |
| | ) | |
| UNITED STATES GOVERNMENT | ) | |
| DEPARTMENT OF THE NAVY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court for a decision on the merits following a bench trial. This case is a wrongful death action under the Federal Tort Claims Act ("FTCA") filed by plaintiff, Janella Knierim ("Mrs. Knierim"), Personal Representative of the Estate of Patrick Joseph Knierim ("Mr. Knierim"), against defendant, United States Government Department of the Navy ("Navy"). Mrs. Knierim seeks damages for the death of Mr. Knierim in a vehicle accident with Electrician's Mater First Class Jeffrey Rosado ("EM1 Rosado"), a Navy recruiter. On June 14–15, 2011, the Court conducted a bench trial in this matter in Terre Haute, Indiana. Mrs. Knierim appeared in person and by counsel, James O. McDonald. The Navy appeared by counsel, Margaret Schutte and Thomas Kieper.

This Memorandum Opinion and Order is intended to serve as the Court's findings of fact and conclusions of law after having examined the entire record and after having determined the credibility of the witnesses as contemplated by Rule 52(a) of the Federal Rules of Civil Procedure. Any factual statement or finding more appropriately considered a conclusion of law shall be so deemed and vice versa.

# I. FINDINGS OF FACT

## A. THE ACCIDENT

On May 30, 2008, EM1 Rosado, who at the time was acting within the scope of his employment with the Navy, was operating a 2007 Chevrolet Impala ("Vehicle") owned by the General Services Administration. Joint Stipulation of Facts ("JSF") [Dkt. No. 55] ¶ 1. EM1 Rosado maintained a valid Indiana driver's license expiring June 5, 2013. *Id.* ¶ 4. EM1 Rosado was driving from the MEPS Processing Station in Indianapolis, Indiana with a potential recruit, Brandon Hathaway, back to Mr. Hathaway's residence in Brazil, Indiana. Rosado Dep. [Stip. Exh. 31] 29:13–23. EM1 Rosado exited Interstate 70 and began traveling north on State Highway 59 ("Highway 59"). *Id.*; JSF ¶ 10.

Mr. Knierim was traveling north on Highway 59 on his motorcycle ("Motorcycle") approaching the intersection of Highway 59 and White Rock Road in Clay County, Indiana, when the Vehicle struck him from behind. JSF ¶ 1. Mr. Knierim had brought the Motorcycle to a stop or near stop and was preparing to turn west onto White Rock Road. *Id.* ¶ 5; Fagg Dep. [Stip. Exh. 32] 5:19–6:13. Melvin L. Fagg, an employee of the Clay County Highway Department who was traveling south in his dump truck on Highway 59, saw Mr. Knierim's turn signal activated. Fagg Dep. 5:4–15, 6:14–21. EM1 Rosado testified that he did not see Mr. Knierim's turn signal. JSF ¶ 6. Immediately prior to the accident, EM1 Rosado was neither speaking to Mr. Hathaway, who was asleep in the passenger seat of the Vehicle, nor using a cell phone. *Id.* ¶¶ 8–9; Rosado Dep. 27:2–6.

The posted speed limit at the intersection of Highway 59 and White Rock Road was forty miles per hour. JSF ¶ 14. A half a second prior to the accident, the Vehicle was traveling at fifty-seven miles per hour, down from its speed of sixty miles per hour one to

2

two seconds before the accident. Bollinger Report [Stip. Exh. 17] at 6; *see also* JSF ¶ 15. The roadway to the right of the Motorcycle was wide enough to allow the Vehicle to pass on the right and continue north on Highway 59, and there was no other vehicle preventing EM1 Rosado from moving the Vehicle to the right. *Id.* ¶ 21. EM1 Rosado slightly swerved the Vehicle but made contact with the Motorcycle. T. Pearce Dep. [Stip. Exh. 28] 9:1–5. Neither vehicle left pre-accident skid marks. Carter Dep. [Stip. Exh. 30] 10:8–15, 11:5–16. The Motorcycle did, however, leave a post-accident scuff mark. *Id.* at 11:20–12:5.

Following the impact, EM1 Rosado brought the Vehicle to a controlled stop on the side of Highway 59. *Id.* at 9:16–24. Emergency personnel arrived and transported Mr. Knierim via ambulance to St. Vincent Clay Hospital, where he was pronounced dead. Autopsy Report [Stip. Exh. 15] at 2. The death certificate listed the cause of death as "Blunt Force Trauma to Head and Neck." JSF ¶ 2. At the time of death, Mr. Knierim was sixty-three years old. *Id.* ¶ 23.

As a result of the collision, EM1 Rosado pleaded guilty to driving 60 miles per hour in a 40 mile per hour speed zone and following too closely in Clay Superior Court. *Id.* ¶ 20.


## B. BIOGRAPHICAL INFORMATION

By all accounts, Mr. Knierim lived a happy life. Mr. Knierim and Mrs. Knierim, who was born in mid-spring 1948, were married on July 18, 1967, and had been married continuously for over forty years at the time of the accident. *Id.* ¶¶ 25, 41. The Knierims met during Mrs. Knierim's senior year of high school, approximately 1965 or 1966, in Brazil, Indiana. J. Knierim Trial Testimony. Following high school, Mrs. Knierim entered college

at Indiana State University but quit when she became pregnant with their daughter, Michelle, who was born in 1968. *Id.* The Knierims also later had a son, Robert. *Id.*

Mr. Knierim had a number of siblings, three of whom are still living. His two oldest sisters, Sister Imelda (Catherine) and Sister Bernadine (Nancy) the oldest of whom is eighty-two, are nuns. Obituary for Patrick Knierim [Stip. Exh. 6]. Mr. Knierim's other surviving sister, Rosemary, lives with her husband in St. Louis. *Id.* Two of Mr. Knierim's siblings passed away before him. His brother, William, died in February 2008. *Id.* His sister, Theresa, died of a stroke in 1984. *Id.* Both of Mr. Knierim's parents predeceased him. *Id.*

Mr. Knierim worked as an automotive mechanic from the beginning of the Knierims' marriage until his retirement. In the early days of their marriage, Mr. Knierim worked at the J.C. Penney Auto Center at Lafayette Square Mall in Indianapolis. J. Knierim Trial Testimony. During this time, the Knierims lived in Danville, Indiana. *Id.* Mr. Knierim then began working at the Montgomery Ward Auto Center in Terre Haute. *Id.* In 1981, Mr. Knierim went into business for himself and opened his own alignment garage in Brazil. *Id.*

In 1975, the Knierims built a home in Brazil. *Id.* Most of the Knierims' family and high school friends were still living in the Brazil area. *Id.* Throughout their time in the Brazil home, the Knierims did extensive remodeling, mostly on their own. *Id.* Mrs. Knierim continues to live in the Brazil home and does not believe that she will sell it, as she still feels Mr. Knierim's presence there. *Id.*

In 1980, Mrs. Knierim started working at as a secretary at Clay Community Schools. *Id.* She eventually began working in educational media, and school officials encouraged her to go back to college and finish her degree. *Id.* In 1989, at the age of forty-one, Mrs.

Knierim returned to Indiana State to earn an undergraduate degree in educational media. *Id.* She worked full-time and went to school part-time, except during the last year, when she quit working to focus on her student teaching. *Id.* Mr. Knierim was very supportive of her decision to return to school, volunteering to complete more housework to allow Mrs. Knierim to study. *Id.*

Following her graduation from Indiana State, Mrs. Knierim took a position as a Media Specialist at Sugar Grove Elementary School ("Sugar Grove") in Vigo County School Corporation, where she has been employed for the past eighteen years. *Id.* While working at Sugar Grove, Mrs. Knierim earned a scholarship and was able to complete her master's degree. *Id.* Once again, Mr. Knierim was her "cheerleader," taking on greater household responsibilities to allow her time to study while maintaining a "clean and organized home." *Id.*

Throughout Mrs. Knierim's career as an educator, Mr. Knierim supported her work above and beyond the support provided by a typical teacher's spouse. Mr. Knierim attended various school functions with his wife, including festivals, book fairs, and holiday parties. *Id.* Few other spouses came to these events. *Id.* According to April Newton, one of Mrs. Knierim's coworkers, her husband and Mr. Knierim were the only spouses who regularly attended faculty social events with their wives. Newton Trial Testimony. Mr. Knierim was quiet but sociable, pleasant, and funny. *Id.* He made an effort to make friends with his wife's coworkers. J. Knierim Trial Testimony.

In 2006, Mr. Knierim retired from his alignment garage. *Id.* He told his wife that he would take on all of the housework so that they would both have weekends free to spend time together. *Id.* Throughout their marriage, Mr. Knierim did the dishes and some of the

yard work, as well as maintenance on the family vehicles. *Id.* Following his retirement, Mr. Knierim took on a number of additional responsibilities, including vacuuming, dusting, grocery shopping, and various household errands. *Id.* In total, Mr. Knierim completed between two and three hours of household chores per day. JSF ¶ 38. Because the vast majority of household tasks were completed by Mr. Knierim during the week while Mrs. Knierim was at work, they had most weekends free. J. Knierim Trial Testimony. During his retirement, Mr. Knierim's only income was a Social Security payment of $998.00 per month. JSF ¶ 43.

In addition to various household tasks, Mr. Knierim assisted his wife in caring for her elderly parents. In approximately 2001 or 2002, Mrs. Knierim's father began showing early stages of dementia and became forgetful. J. Knierim Trial Testimony. In 2003, the Knierims moved Mrs. Knierim's parents from their farm into Brazil to allow for easier access. *Id.* Mr. Knierim performed various tasks for Mrs. Knierim's parents, including driving them to doctor's appointments in Bloomington, Indianapolis, and Terre Haute; and car maintenance. *Id.* At night, Mr. Knierim often would go with his wife and assist her father when he would fall and was unable to get up again. *Id.* Following Mr. Knierim's death, Mrs. Knierim's father's health deteriorated further, culminating in his moving into a nursing home in January 2009 and passing away before trial. *Id.*

In his spare time, Mr. Knierim enjoyed reading, especially about local history, and riding motorcycles. *Id.* To improve his health, Mr. Knierim exercised at the local YMCA routinely. *Id.* He regularly got together with other retired men at the Coffee Cup Restaurant in Brazil, where they would drink coffee and joke with the waitresses. *Id.* Mr. Knierim always drank decaffeinated coffee because it was better for his health, and the

waitresses affectionately called him "Decaf Pat." *Id.* Mr. and Mrs. Knierim would often go to antique car shows and festivals on the weekends. *Id.* They would go out to dinner every Sunday after church. *Id.* They also enjoyed trips to Branson, Missouri, and would usually take a trip there around their anniversary. *Id.*

Mr. Knierim was a devoted father and grandfather. While his children were growing up, he was involved in their activities, including softball, baseball, cross country, and band. *Id.* Mr. Knierim had five grandchildren, and he liked spending time with them. *Id.* He would take them on various outings, including the park, Dairy Queen, or camping trips. *Id.*; R. Knierim Trial Testimony.

The Knierims' son, Robert, would see his parents three or four times a week, and he saw Mr. Knierim approximately two hours before the accident. R. Knierim Trial Testimony. Robert stated that his parents had a good relationship. *Id.* Following Mr. Knierim's death, Robert helped Mrs. Knierim with some of the more strenuous household chores, such as mowing the grass and carrying heavy items. *Id.*

Michelle, the Knierims' daughter, echoed Robert's sentiments. She and her son, Cole, would go over to her parents' house for dinner every Wednesday night and had been doing so for several years. Neese Trial Testimony. Michelle indicated that Mr. Knierim had been healthier after his retirement, and the Knierims had plans to go out and do things nearly every weekend. *Id.* The Knierims would regularly attend church together, and Mr. Knierim would take his wife shopping. *Id.*

Following the accident, Mrs. Knierim was appointed Personal Representative of the Estate of Patrick J. Knierim, Deceased. JSF ¶ 44. Mrs. Knierim indicated that since her husband's death, she rarely attends social events. J. Knierim Trial Testimony. She spends

7

most of her free time with her mother, who also recently lost a spouse, so neither of them will get too lonely. *Id.* Mrs. Knierim now performs nearly all the household chores. *Id.* She has hired neighborhood boys to cut her grass on hot days, and she hired a company to power wash the exterior of her home. *Id.* She remains employed at Sugar Grove and says that, although she had previously filed the paperwork to retire in 2012, she is now reconsidering retirement because working keeps her busy. *Id.* Mrs. Knierim does not plan to remarry. *Id.*


## C. LIFE EXPECTANCY

In an April 25, 2011 Order prior to trial, the Court excluded testimony from the Navy's proposed life expectancy expert, Dr. Anthony Milano ("Dr. Milano"). *See* dkt. no. 68. Dr. Milano proposed to testify regarding the effect of Mr. Knierim's health conditions on his overall life expectancy. In excluding Dr. Milano's testimony, the Court concluded that his testimony would not be helpful for the trier of fact, as the effects of common health conditions such as Mr. Knierim's are well known without expert testimony. *Id.* at 2. At trial, the Navy was permitted to proffer Dr. Milano's opinions, including his conclusion that, given his health issues, Mr. Knierim's life expectancy would be only 5.46 more years.

Having further considered Dr. Milano's proposed testimony, the Court remains convinced that exclusion of that testimony is proper. Expert witnesses are permitted to give opinion testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. Expert opinions must be both reliable and helpful to the trier of fact. *Accord. id.* Reliability

of an expert opinion requires (1) the testimony must be based on sufficient facts or data; (2) the testimony must be the product of reliable principles and methods; and (3) the expert must apply the principles and methods reliably to the facts of the case.  *United States v. Conn*, 297 F.3d 548, 555 (7th Cir. 2002).  Dr. Milano's report, previously reviewed by the Court, does not appear helpful to the trier of fact.  In addition to opining about issues within the everyday grasp of the fact-finder—namely, that certain health conditions such as heart disease and high blood pressure, as well as a family history of such conditions, can decrease a person's life expectancy—Dr. Milano's methodology is of questionable reliability.[1]

Of particular concern to the Court is Dr. Milano's apparent double-counting of certain health risk factors without any consideration of how those risk factors interact with each other.  For example, Dr. Milano discounts Mr. Knierim's life expectancy separately for atherosclerosis and hypertension/high blood pressure, even while admitting that atherosclerosis can be at least partly caused by high blood pressure.  *See* dkt. no. 64-1 at 12, 18–20 ("Atherosclerosis is thought to begin when an injury stimulus, for example, elevated levels of cholesterol, high blood pressure, or tobacco use damages the smooth lining of the arterial walls.").  Additionally, Dr. Milano's methodology does nothing to explain why use of the Life Tables is inadequate.  Courts have often found the Life Tables to be a reasonable estimate of life expectancy, even while acknowledging that their predictions are not absolute.  *See, e.g.*, *Kern v. Radez*, 665 F. Supp. 2d 982, 987 (S.D. Ind. 2002)

---

[1]  The Court notes that Dr. Milano's methodology relies on many of the same methods as the life expectancy expert excluded by Judge Settle in *Fisher v. United States*, No. C09-5146, 2010 WL 3835188, at *4–*5 (W.D. Wash. Sept. 28, 2010).  Although *Fisher* is not binding on this Court, the Court largely agrees with its analysis as to the reliability of life expectancy methodology like that used by Dr. Milano.

(Hamilton, J.) (citing *Ashland Pipeline Co. v. Ind. Bell. Tel. Co.*, 505 N.E.2d 483, 490 (Ind. Ct. App. 1987)). Additionally, it is undisputed that the Life Tables take into account a cross-section of the U.S. population, including persons with health conditions similar to Mr. Knierim's. *Cf.* National Vital Statistics Reports, U.S. 2007 (May 20, 2010) (compiling information from all death certificates and noting that the leading cause of death is "diseases of heart"). In short, even after revisiting the issue, the Court concludes that Dr. Milano's testimony is inadmissible and, therefore, declines to consider it in reaching the findings and conclusions of this Memorandum Opinion and Order.

At the time of his death, Mr. Knierim was sixty-three years old. JSF ¶ 23. According to the Centers for Disease Control and Prevention Life Expectancy Tables for White Males, United States, 2003, Mr. Knierim's life expectancy at the time of his death was 18.3 years. *Id.* ¶ 24. At the time of Mr. Knierim's death, Mrs. Knierim was sixty years old and, according the Centers for Disease Control and Prevention Life Expectancy Tables for White Females, United States, 2003, had a remaining life expectancy of 23.7 years. *Id.* ¶ 26. As the parties did not contest Mrs. Knierim's life expectancy, the Court now finds Mrs. Knierim's life expectancy to be 23.7 years as of May 30, 2008. However, the parties contest whether the Centers for Disease Control and Prevention Life Expectancy Tables ("Life Tables") adequately predict Mr. Knierim's life expectancy in this case.

The Navy contends that Mr. Knierim's health history indicates that the life expectancy given in the Life Tables is too high. Mr. Knierim's family history includes the following health problems:

▸ Cardiovascular disease: Mr. Knierim's father died of a heart attack at age 64, having suffered two prior heart attacks. *Id.* ¶ 34.

▸  Cancer: Mr. Knierim's mother died from cancer at age 73.  *Id.* ¶ 35.

▸  Diabetes: Mr. Knierim's father suffered from diabetes.  *Id.* ¶ 36.

▸  Stroke: One of Mr. Knierim's sisters died of a "massive stroke" at age 53.  *Id.* ¶ 37.

In addition to Mr. Knierim's family history, the Navy points to items in Mr. Knierim's own health history.  Mr. Knierim's medical history includes a number of cardiovascular issues. In 2001, Mr. Knierim had an angioplasty with one stent inserted.  *Id.* ¶ 32.  Further, Mr. Knierim had been diagnosed with coronary artery disease, atherosclerosis, hypertension, and cardiovascular disease.  *Id.* ¶¶ 27–29, 31.  The autopsy indicates that at the time of death, Mr. Knierim's left main coronary artery was fifty percent blocked, and his life anterior descending coronary artery was ninety percent blocked.  Autopsy Report at 4.  Additionally, Mr. Knierim had been diagnosed as obese.  JSF ¶ 30.  Lastly, Mr. Knierim started smoking as a teenager and smoked until January 2008.  *Id.* ¶ 37.

Mrs. Knierim, in contrast, argues that the Navy overplays Mr. Knierim's health issues.  Regarding Mr. Knierim's cardiovascular issues, Mrs. Knierim notes that Mr. Knierim had regular check-ups with his cardiologist every six months following his 2001 surgery. *Id.* ¶ 32; *see also* P. Knierim Medical Records [Stip. Exh. 16].  Since his retirement, Mr. Knierim had joined the YMCA and exercised regularly, and Mrs. Knierim encouraged her husband to eat healthfully.  J. Knierim Trial Testimony.  He drank decaffeinated coffee because it was better for his heart.  *Id.*  He was taking medications to control his blood pressure and cholesterol.  *Id.*  Additionally, although technically diagnosed as obese, Mrs. Knierim argues that Mr. Knierim's weight—approximately 180 pounds at the time of death, *see* Autopsy Report at 2—was well within a manageable range.  Mrs. Knierim further

directs the Court to the overall life tables, which suggest that married men have longer life expectancies than similarly-aged single men. *See* National Vital Statistics Reports, U.S. 2007 (May 20, 2010) [Stip. Exh. 14] at 11–12.

In light of all the evidence presented about Mr. Knierim's health, the Court finds the Life Tables' life expectancy of 18.3 years to be appropriate. Although the evidence shows that Mr. Knierim had health issues, the evidence also indicates that he was taking steps to treat and remedy these issues, including increased exercise, regular cardiologist visits, and quitting smoking. Mr. Knierim's family history of health problems is of some concern, but this concern is lessened by the good health of Mr. Knierim's three surviving sisters, the oldest of whom is eighty-two. J. Knierim Trial Testimony. Overall, the Court does not find sufficient evidence to justify deviation from the Life Tables and, consequently, finds Mr. Knierim's life expectancy at the time of death to be 18.3 years.


### D. PERSONAL CONSUMPTION RATE

Mrs. Knierim and the Navy both presented expert economists who opined as to a personal consumption rate for Mr. Knierim, as well as an estimate of the value of uncompensated household services provided by Mr. Knierim. The personal consumption rate represents the percentage of income spent solely for Mr. Knierim's personal benefit, without a benefit to any other person. Mr. Knierim's personal consumption rate affects both the percentage of lost income and the overall value of uncompensated household services that Mrs. Knierim is entitled to recover.

Mrs. Knierim's economist, Dr. Phillip Rushing ("Dr. Rushing"), is a professor emeritus

of finance at the University of Illinois with thirty-nine years of experience. Rushing Curriculum Vitae ("Rushing CV") [Stip. Exh. 22] at 1; *see also* Rushing Trial Testimony. Dr. Rushing earned his bachelor's degree in economics with honors from Colorado State University in 1967. Rushing CV at 1. He earned a master's degree and a Ph.D in economics from the University of Illinois in 1969 and 1971, respectively. *Id.* Dr. Rushing has published number of academic articles in his field and has been qualified previously as an expert witness numerous times in federal court as well as the Illinois Supreme Court. Rushing Trial Testimony; *see also* Rushing Report [Stip. Exh. 21] at 1. The Court concludes that Dr. Rushing is qualified as an expert in economics.

Dr. Rushing opined that an appropriate personal consumption rate for Mr. Knierim would be twenty percent. Rushing Trial Testimony. In coming to this conclusion, Dr. Rushing relied on an unpublished study by a colleague suggesting that an appropriate personal consumption rate for a person with Mr. Knierim's characteristics is fourteen percent. *Id.* However, Dr. Rushing was unable to provide either an author or a title for this study, stating that the author wished to remain anonymous until completing the study *Id.*

The Navy's economist, Dr. Bruce Jaffee ("Dr. Jaffee"), has taught in the Department of Business Economics and Public Policy at Indiana University since 1971. Jaffee Trial Testimony. He earned a bachelor's degree in mathematics-economics from Brown University in 1967. Jaffee Curriculum Vitae ("Jaffee CV") [Stip. Exh. 36] at 1. He earned his master's degree and Ph.D. in economics from Johns Hopkins University in 1969 and 1971, respectively. *Id.* Dr. Jaffee has taught a number of courses in economics and economic policy at the undergraduate and graduate level. *Id.* at 4. He has authored a number of academic articles and newspaper articles about economic subjects. *Id.* at 5.

Dr. Jaffee's opinion has been excluded in previous cases. *See generally Brunker v. Schwan's Home Serv., Inc.*, No. 2:04-cv-478, 2006 WL 5186489 (N.D. Ind. Oct. 23, 2006) (Dr. Jaffee's testimony excluded as "offer[ing] nothing more than conclusions unsupported by principles or methodology"); *see also Skirvin v. Skirvin*, 560 N.E.2d 1263, 1265 & n.2 (Ind. Ct. App. 1990) (reason for exclusion not provided). However, the Court does not believe that Dr. Jaffee's exclusion in these previous cases negatively affects his testimony in this case, and Dr. Jaffee's report contains sufficient detail and a description of his methodology to allow its entrance in this case. *See generally* Jaffee Report [Stip. Exh. 35]. Therefore, the Court concludes that Dr. Jaffee also is qualified as an expert in economics.

Dr. Jaffee opined that an appropriate personal consumption rate for Mr. Knierim would be 32.3 percent. Jaffee Trial Testimony; *see also* Jaffee Report at 4. In arriving at this conclusion, Dr. Jaffee purports to use a study by Elizabeth M. King and James P. Smith entitled *Computing Economic Loss in Cases of Wrongful Death* ("King and Smith Study"). Jaffee Report at 4. However, in reviewing the portion of this study provided as an attachment to Dr. Jaffee's report, the Court finds inadequate basis for Dr. Jaffee's 32.3 percent number. Indeed, the study states that for a family of two with a household head aged 35–54, the personal consumption rate is 23.4 percent. Jaffee Report Attachment 5 at Table 7.2. Although Mr. Knierim was sixty-three years old at the time of his death, rather than the maximum of fifty-four years used in the table discussed above, Dr. Jaffee's report provides no explanation of why Mr. Knierim's personal consumption would be so much higher than the percentages in the study upon which he relies.

Reviewing the opinions of both experts, the Court determines that neither opinion is entirely adequate. Neither Dr. Rushing nor Dr. Jaffee point to a study directly supporting

14

their conclusion as to Mr. Knierim's personal consumption rate. Although not mirroring Mr. Knierim's personal characteristics exactly, the Court concludes that the King and Smith Study gives the best explanation for how it arrived at its conclusions regarding general personal consumption rates. Although the portions of the King and Smith Study provided to the Court do not specifically give personal consumption rates for persons in Mr. Knierim's age category, the Court finds the personal consumption for a family of two with the head of household aged 35–54 is a sufficient measure for someone of Mr. Knierim's age as well because the household equivalence scale rate—134.2—for that type of household with the head of household aged 35–54 is the same when the head of household is aged 55–64. *See* Jaffee Report Attachment 5 at Table 7.1. This suggests that the personal consumption rate for a member of a two-person household does not change significantly when the household head is sixty-three, Mr. Knierim's age, from when the household head was aged 35–54 and, therefore, that the 23.4 percent personal consumption rate remains appropriate. Additionally, this is in accord with Mrs. Knierim's lay estimate at trial that Mr. Knierim would spend "very little," approximately twenty to twenty-five percent, of his income solely on himself. J. Knierim Trial Testimony. The Court, therefore, finds Mr. Knierim's personal consumption rate to be 23.4 percent.

## II. CONCLUSIONS OF LAW

As a tort action against an agency of the United States, this case falls under the FTCA. 28 U.S.C. § 1346. Mrs. Knierim fulfilled the notice requirements of the FTCA by filing her Tort Claims Notice on or about May 7, 2009. JSF ¶ 49. The FTCA allows for a

limited waiver of sovereign immunity and the imposition of liability "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Warrum v. United States*, 427 F.3d 1048, 1049–50 (7th Cir. 2005). In this case, the accident took place in Clay County, Indiana, so the substantive tort law of Indiana applies. *White v. United States*, 148 F.3d 787, 793 (7th Cir. 1998).

## A. LIABILITY

For liability of any kind to attach under the FTCA, a plaintiff must prove that the tortfeasor is an employee of the Government who committed the tort "while acting within the scope of his office or employment[.]" 28 U.S.C. § 2679(b)(1). Prior to trial, the parties stipulated that EM1 Rosado was a Government employee at the time of the accident and, further, that he was acting with the scope of his employment. JSF ¶ 1. Therefore, the Navy is liable under the FTCA if EM1 Rosado was negligent and through his negligence caused the accident at issue.

To prove negligence under Indiana law, a plaintiff must establish: (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; and (3) that the breach proximately caused the plaintiff's damages. *Caesars Riverboat Casino, LLC v. Kephart*, 934 N.E.2d 1120, 1123 (Ind. 2010). As to elements one and three, the parties agree that, in operating the Vehicle, EM1 Rosado had a duty to operate the Vehicle within the bounds of the posted speed limit, to maintain a lookout for other vehicles using the roadway that were slowing or stopped in front of his Vehicle, and to maintain control of the

Vehicle. JSF ¶ 18. Additionally, the parties agree that the accident caused Mr. Knierim's death. *Id.* ¶ 2 ("Mr. Knierim died as a result of the collision . . ."). Therefore, the only issue for the Court to determine as to liability is whether EM1 Rosado's operation of the Vehicle breached his duties to Mr. Knierim.

The Court concludes that EM1 Rosado breached his duties to Mr. Knierim. The evidence shows that EM1 Rosado was operating the Vehicle significantly faster than the posted speed limit. The posted speed limit at the scene of the accident is forty miles per hour. Carter Dep. 14:4–8. EM1 Rosado was operating the Vehicle "as much as 20 miles an hour in excess of the posted speed limit[.]" JSF ¶ 19. Charles Bollinger, Mrs. Knierim's expert in crash reconstruction, opined that based on the information obtained from the Air Bag Control Module, the Vehicle was traveling at fifty-seven miles per hour upon impact. Bollinger Report at 7. EM1 Rosado pleaded guilty to speeding and following too closely as a result of the accident. JSF ¶ 20.

Additionally, the evidence shows that EM1 Rosado likely could have avoided the collision had he been paying attention to the conditions around him. The roadway to the right of the Motorcycle was wide enough to allow EM1 Rosado to pass Mr. Knierim, and there were no other vehicles preventing EM1 Rosado from doing so. *Id.* ¶ 21. The Air Bag Control Module indicated that EM1 Rosado applied the brakes on the Vehicle approximately a half a second before the collision. Bollinger Report at 7. Traveling at approximately sixty miles per hour, the Vehicle would have taken 3.912 seconds to come to a complete stop. *Id.* at 6. In other words, EM1 Rosado braked well after he should have to avoid striking the Motorcycle.

Because EM1 Rosado had a duty to maintain proper speed and control of the

Vehicle; breached that duty by driving as much as twenty miles per hour faster than the speed limit and not slowing the Vehicle in proper time; and caused Mr. Knierim's death by his actions; EM1 Rosado was negligent in causing the accident that killed Mr. Knierim. Accordingly, under the FTCA, the Navy is liable for EM1 Rosado's negligence.

## B. COMPARATIVE FAULT

Indiana's law of comparative fault applies to this action. JSF ¶ 45. Accordingly, in the event that the Court determines that the accident was at least fifty percent EM1 Rosado's fault, Mrs. Knierim is entitled to recover the percentage of total damages determined to be the fault of EM1 Rosado rather than Mr. Knierim. *Id.* Upon reviewing all the evidence, the Court determines that there is no comparative fault attributable in this case. The parties stipulate that "Mr. Knierim's motorcycle was at a stop or near stop with his turn signal activated[.]" JSF ¶ 12; *see also id.* ¶ 19. EM1 Rosado testified that Mr. Knierim "stopped short" at the intersection. Rosado Dep. 25:16–19. However, a number of other witnesses to the accident undermine his testimony. *See, e.g.*, M. Pearce Dep. [Stip. Exh. 27] 8:22–9:5; T. Pearce Dep. 8:13–19; Pollom Dep. [Stip. Exh. 26] 19:10–13. In addition, both Bollinger and Indiana State Police Crash Reconstructionist Chris Carter testified that the Motorcycle left no pre-crash skid marks, which would be expected if the Motorcycle had stopped short in accordance with EM1 Rosado's testimony. Carter Dep. 11:5–12:5; Bollinger Trial Testimony. The Court concludes that Mr. Knierim was not negligent in any way and, therefore, no reduction to Mrs. Knierim's recovery is warranted under comparative fault.

## C. DAMAGES

Having concluded that the Navy is liable for EM1 Rosado's negligence, the Court turns to consider appropriate damages to be awarded to Mrs. Knierim. Recovery is determined under Indiana's wrongful death statute, IND. CODE § 34-23-1-1. Under the FTCA, the total amount of recovery may not exceed Mrs. Knierim's initial administrative notice amount, in this case $4,017,087.25. JSF ¶ 49.

On behalf of Mr. Knierim's estate, Mrs. Knierim is entitled to recover "reasonable medical, hospital, funeral and burial expenses." IND. CODE § 34-23-1-1 (2010). In the same capacity, Mrs. Knierim may also recover for property damage caused by the accident. Lastly, Mrs. Knierim may recover on her own behalf an amount of money that will "fairly compensate" her for Mr. Knierim's death, taking into account the following factors:

1) Mr. Knierim's age, health, and life expectancy immediately before the injury causing his death;

2) Mr. Knierim's occupation and earning capacity, and probable future earnings reduced by his personal living expenses, had he lived;

3) The value of future support that Mrs. Knierim could reasonably have expected to receive from her husband; and

4) The loss of love, care, and affection that Mrs. Knierim could reasonably have expected to receive from the continued life of Mr. Knierim.

Indiana Model Civil Jury Instructions, Indiana Instruction No. 727 (LexisNexis Matthew Bender 2010). Indiana's law of wrongful death further allows recovery of the cost of administering the estate, the costs of pursuing wrongful death litigation, and reasonable attorney's fees. *See id.* However, the parties agree that these categories of damages are not recoverable under the FTCA. JSF ¶ 46 n.1. Punitive damages may not be awarded.

*Durham v. U-Haul Int'l*, 745 N.E.2d 755, 763–64 (Ind. 2001).

## 1. MEDICAL EXPENSES, PROPERTY DAMAGE, AND LOST EARNINGS

Mrs. Knierim is entitled to recovery of a variety of economic damages, including medical expenses, property damage, lost earnings, and the value of household services performed by Mr. Knierim. The parties stipulated as to some of the more easily calculable damages. The parties stipulated to Mr. Knierim's medical, hospital, funeral, and burial expenses as a result of the accident. These expenses are as follows:

| | | |
|---|---|---|
| ▸ | St. Vincent Hospital | $ 3,563.15 |
| ▸ | Trans Care (Ambulance) | $ 607.00 |
| ▸ | Funeral | $ 7,606.70 |
| ▸ | Grave Marker | $ 4,760.50 |
| | TOTAL | $ 16,537.35 |

*Id.* ¶ 47. Therefore, on behalf of the estate, Mrs. Knierim is entitled to $16,537.35 in medical, hospital, funeral, and burial expenses. In addition, the parties stipulated that Mrs. Knierim is entitled to recover $250.00 in property damage, the amount not compensated by the insurance company for total loss of the Motorcycle. *Id.* ¶ 48.

The lost earnings component of damages is also easily calculated. At the time of Mr. Knierim's death, Mr. Knierim was retired and receiving Social Security benefits of $998.00 per month. JSF ¶ 43. Multiplying this amount by Mr. Knierim's remaining life expectancy of 18.3 years, Mr. Knierim would have earned $219,160.80 in Social Security benefits over his remaining life. Applying a personal consumption rate of 23.4 percent, the Court concludes that Mr. Knierim would have personally consumed $51,283.63 of the Social Security income. Therefore, Mrs. Knierim is entitled to recover the remaining

amount, or $167,877.17, in lost earnings.

## 2. VALUE OF HOUSEHOLD SERVICES

Both Mrs. Knierim and the Navy solicited testimony from experts regarding the value of the household services Mr. Knierim would have provided had he lived.  Examining the experts' conclusions, the Court cannot subscribe to either Dr. Rushing's or Dr. Jaffee's ultimate conclusions because the calculations of both experts rely on the assumption of facts not born out by the evidence.  As stated above, the Court finds Mr. Knierim's life expectancy to be 18.3 years and his personal consumption rate to be 23.4 percent.  In calculating the value of Mr. Knierim's household services, Dr. Rushing used a life expectancy of 17.97 years and a personal consumption rate of twenty percent, while Dr. Jaffee used a life expectancy of eighteen years and a personal consumption rate of 32.3 percent.  *See* Rushing Trial Testimony; Jaffee Trial Testimony.

In addition, the Court finds Dr. Jaffee's use of $9.13 as an hourly wage for providing household services to be too low.  *See* Jaffee Trial Testimony.  Dr. Jaffee stated that his use of $9.13 an hour came from the median national hourly rate for maids and housekeepers in the United States.  *Id.*  However, the tasks of maids and housekeepers do not encompass all the household services provided by Mr. Knierim, including yard work, shopping, and automotive maintenance.  *See* J. Knierim Trial Testimony.  Mrs. Knierim introduced testimony from Debbie Athey, who specializes in services for independently living elderly individuals in the Terre Haute area.  Ms. Athey testified that in her line of work, she completes a number of tasks for elderly individuals to help them remain living independently, including driving people to doctor's appointments, dusting and vacuuming,

bathing individuals, washing windows, landscaping maintenance, and a variety of other activities. Athey Trial Testimony. Ms. Athey further testified that she charges $15.00 an hour for her services, regardless of the task being performed. *Id.* The Court finds that $15.00 per hour is a more reasonable figure for compensation for the types of household tasks completed by Mr. Knierim and will, therefore, use this as the hourly rate for his household services.

As discussed above, Mrs. Knierim testified that Mr. Knierim performed two to three hours of household services per day and that they had weekends "free" to spend time together. J. Knierim Trial Testimony. The Court, therefore, finds that Mr. Knierim spent fifteen hours a week performing household services. At $15.00 an hour over Mr. Knierim's 18.3 year life expectancy, the total gross value of Mr. Knierim's household services is $214,110.00. With Mr. Knierim's personal consumption rate of 23.4 percent, the total value of household services lost to Mrs. Knierim by virtue of her husband's death is $166,149.36.

### 3. LOSS OF LOVE AND AFFECTION

In addition to economic damages for medical expenses, property damage, lost earnings, and the value of household services, Mrs. Knierim is entitled to non-economic damages for loss of love and affection. In cases with a surviving spouse, Indiana law only permits loss of love and affection damages for the surviving spouse; no loss of love and affection damages are permitted for other non-dependant family members, such as surviving children and grandchildren. IND. CODE § 34-23-1-1. In determining a reasonable award for loss of love and affection damages, courts should consider awards in similar cases. *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008).

22

Mrs. Knierim suggests that the Court's starting point in calculating an award for loss of love and affection should be *TRW Vehicle Safety Systems v. Moore*, 936 N.E.2d 201 (Ind. 2010). In *TRW*, the decedent, who died in a vehicle rollover, was a 40-year-old man with a wife and minor child. 936 N.E.2d at 207. His life expectancy was 37.1 years. *Id.* at 220. At trial, the jury awarded $25,000,000.00 in total damages, approximately $11,300,000.00 of which was allocated to the wife's mental anguish and loss of love and affection damages. *Id.* at 220–21. Although the Indiana Supreme Court reversed other parts of the damage award—namely, certain damages for the minor child and the allocation of damages between the parties at fault—for reasons not relevant to the present case, the Court upheld the portion of damages for the wife's loss of love and affection. *Id.* at 222. Dividing the total loss of love and affection award by the decedent's life expectancy, the award in *TRW* amounts to approximately $304,582.21 per year.

The Navy contends that *TRW* is an outlier case and that the loss love and affection damages should be considerably lower. During closing arguments, the Navy's counsel suggested that $30,000 to $40,000 per year would be adequate compensation. The Navy directs the Court to a number of cases approving of significantly lower loss of love and affection awards than the *TRW* award. *See Kanwar v. United States*, No. IP 99-1112-C, 1990 U.S. Dist. LEXIS 19820, at *10–*11 (S.D. Ind. Feb. 14, 1990) (Dillin, J.) ($20,000.00 per year for 30.98 years); *Pucalik v. Holiday Inns, Inc.*, 777 F.2d 359 (7th Cir. 1985) (approximately $27,000.00 per year for forty-seven years); *Huff v. White Motor Corp.*, 609 F.2d 286 (7th Cir. 1989) (approximately $17,000.00 per year for twenty-three years). Adjusting for inflation, the Navy contends that these cases show an award of $40,000.00 per year or less to be appropriate.

In addition, the parties direct the Court to four unreported cases out of Indiana trial courts: *Everhart v. Indiana Department of Insurance*, *Rybarczyk v. Clarian Health Partners*, *Ballard v. Internal Medicine Associates*, and *Bauserman v. Patient's Compensation Fund*. Of these cases, only *Everhart* has gone through any sort of appellate review, and the Indiana Supreme Court has not addressed the reasonableness of the loss of love and affection awards in any of them. *See Supreme Court Oral Argument Calendar*, IND. SUP. CT., http://www.in.gov/portal/news_events/70510.htm (last visited July 5, 2011) (*Everhart* oral argument focused on the application of RESTATEMENT (SECOND) OF TORTS § 323 in cases where chance of survival absent medical malpractice is greater than fifty percent). Additionally, the awards in these cases are limited under the Indiana Medical Malpractice Act, which limits total compensation and provides an unusual breakdown for apportioning damages between the party committing malpractice and a state-run compensation fund. Although these cases provide limited guidance, the Court will consider them under *Arpin* to the extent they are similar to the case at bar.

*Ballard* fails to shed much light on the present case. It was tried to a jury, rather than the court, and although the jury awards $250,000.00 for loss of love and companionship to six different individuals, there is no indication of those individuals' relationship to the decedent. *Ballard v. Internal Med. Assoc.*, No. 53C06-0706-CT-01330, at 3 (Monroe Cir. Ct. Oct. 22, 2008). Plaintiff indicates that the individuals are non-dependent adult children. Dkt. No. 66 at 3. Additionally, there is no finding as to the decedent's remaining life expectancy that would allow the Court to determine how the *Ballard* award would be divided over a number of years.

In *Everhart*, the Vigo County Superior Court found that the surviving wife and minor

24

child of decedent incurred "a sum in excess of" $3,150,000.00 in damages[2] as a result of decedent's wrongful death due to medical malpractice when the decedent had a life expectancy of 37.6 years. *Everhart v. Ind. Dep't of Ins.*, No. 84D02-0410-CT-10001, at 2, 17 (Vigo Sup. Ct. Nov. 13, 2009), *rev'd on other grounds*, 932 N.E.2d 684, *trans. granted.* In simple terms, these damages amount to approximately $84,000.00 a year. However, *Everhart* is only of limited applicability to the present case. The *Everhart* court provides no breakdown of how it arrived at the $3,150,000.00 figure and, indeed, does not set a definite figure at all. Additionally, *Everhart* involves wrongful death recovery for both the surviving wife and surviving minor child, whereas in the present case, the surviving children are not entitled to any recovery, having reached the age of majority. Without more detail as to how the *Everhart* court determined damages, the Court cannot draw definitive conclusions as to *Everhart*'s application to this case.

In *Rybarzyck*, the Marion County Superior Court awarded the surviving spouse $2,000,000.00 in damages for the loss of decedent's love, affection, companionship, and services, finding that decendant would have had a remaining life expectancy of ten years. *Rybarzyck v. Clarian Health Partners, Inc.*, No. 49D02-0805-CT-022190, at 8 (Marion Super. Ct. June 15, 2009). In other words, the *Rybarzyck* court awarded loss of love and affection damages of $200,000.00 a year. *Rybarzyck* is much closer factually to the case at bar. The decedent and surviving spouse had been married over forty years, and no surviving children were set to share in the loss of love and affection award. Additionally, unlike the *Everhart* court, the *Rybarzyck* court explained how the limitations of Indiana's

---

[2] Due to statutory award limits, the *Everhart* court awarded the plaintiffs $1,000,000.00, the maximum recovery allowed by statute. *Id.* at 17.

medical malpractice law affected its calculations. However, the *Rybarzyck* court did not perform a separate calculation for loss of household services as the Court has done in this case; instead, loss of household services is included in the $2,000,000.00 figure.

In *Bauserman*, the last trial level case presented by the parties, the surviving wife was awarded $650,000.00 for the wrongful death of her husband at the hands of a nursing home. *Bauserman v. Patient's Compensation Fund*, No. 49C01-0412-CT-4443, at 10 (Marion Cnty. Cir. Ct. June 23, 2005). Although the *Bauserman* court does not engage in a detailed breakdown of damages, it appears that $9394.10 in damages account for burial expenses. *Id.* at 7. Assuming the rest of the award constitutes compensation for loss of love and affection and taking into account the court's finding of a 6.5 year life expectancy, the *Bauserman* court awarded approximately $98,554.75 per year in loss of love and affection damages. *Id.* at 8. Like *Rybarzyck*, the *Bauserman* court did not separate the value of lost household services from the loss of love and affection damages. However, because the *Bauserman* decedent was afflicted with Alzheimer's Disease and confined to a nursing home, it is likely those household services were minimal.

The Court recognizes that no amount of money will adequately compensate Mrs. Knierim for the loss of her husband. Mr. and Mrs. Knierim were happily married for nearly forty years, and all the evidence suggests that Mr. Knierim was a devoted husband, father, and grandfather. The Court agrees with the Navy that the *TRW* award, although upheld by the appellate courts, appears to be an outlier on the high end. However, the Court also recognizes that the awards in the cases cited by the Navy are likely on the low end of the spectrum, particularly given the amount of time that has passed since they were decided. In terms of factual comparison, *Rybarzyck* and *Bauserman* are the closest comparable

26

cases because they both address recovery for a surviving spouse from a lengthy marriage not sharing recovery with minor children. Based upon awards in similar cases and the evidence presented, the Court concludes that an award of $75,000.00 per year for loss of love and affection is appropriate in this case. This award is in addition to the previously-discussed amounts for economic losses, including loss of household services. Totaled over Mr. Knierim's 18.3 year life expectancy, Mrs. Knierim is entitled to $1,372,500.00 in damages for loss of love and affection.

## III. CONCLUSION

To summarize, the Court concludes that Mrs. Knierim is entitled to damages as follows:

| | |
|---|---|
| ▸ Medical, hospital, funeral, and burial expenses | $ 16,537.35 |
| ▸ Property damage | $ 250.00 |
| ▸ Lost earnings | $ 167,877.17 |
| ▸ Value of household services | $ 166,149.36 |
| ▸ Loss of love and affection | $ 1,372,500.00 |
| TOTAL | $ 1,723,313.80 |

Pursuant to the foregoing findings of fact and conclusions of law, the Court finds for plaintiff, Janella Knierim, Personal Representative of the Estate of Patrick Joseph Knierim, and against defendant, United States Government Department of the Navy, and awards Plaintiff $1,723,313.80.  Judgment shall issue accordingly.

IT IS SO ORDERED this 14th day of July 2011.


LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana


Distribution to:

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

James O. McDonald
EVERETT EVERETT & MCDONALD
jameso@mcdonaldlawoffice.com

Margaret A. Schutte
UNITED STATES ATTORNEY'S OFFICE
margaret.schutte@usdoj.gov